TEMPLE E. SPAULDING *vs.* AMERICAN REALTY COMPANY.

Androscoggin.    Opinion October 2, 1922.

*The terms of a written contract, if the language is clear, definite, and free from ambiguity, are not to be varied, modified, or contradicted, in absence of proven fraud, except where convincing and cogent proof establishes the fact that a change or modification of such written contract was made by a subsequent agreement.*

It is the general rule that oral evidence of preceding or accompanying negotiations is not admissible to vary or to contradict, or to subtract from or add to, the language of a written instrument which speaks for itself in definite and final terms; fraud not being advanced and proved.

The writing is supreme, not because it is a writing, but because it is the perceptible and self-speaking incorporation of the terms agreed to.

While the terms of one agreement may be abrogated, modified, or waived by another subsequently made, yet nothing short of cogent proof will establish the fact of a change in that which originally was reciprocally done.

On report.    This is an action in assumpsit on an account annexed. The general issue was pleaded.    In June, 1920, plaintiff entered into a written agreement with defendant to cut on Township 4, Range 5, in Oxford County, 7500 cords of rough pulp wood, to land same on the banks of Moose Brook and to drive and deliver same into pocket booms on Parmachenee Lake, during the season of 1920-1921.    Under this contract plaintiff was to be paid $9.50 per cord for all pulp wood delivered under it, with advances of $6.00 per cord for all pulp wood cut and yarded, and $2.50 additional when the pulp wood was landed on the bank of Moose Brook.    For every increase of $1.00 per month, average, in woodsmen's wages, from $65 to $78 per month, during the continuance of the contract, defendant agreed to increase the price to be paid the plaintiff ten cents per cord, not to exceed $10.80 in the whole.    After the agreement was signed and the plaintiff entered upon the performance of it, the price of labor increased, and plaintiff claims that in several conversations that he had with defend-

ant's agent, Robert A. Braman, an agreement was reached under which plaintiff was to receive more than was stipulated in the written contract. Judgment for defendant.

The case is fully stated in the opinion.

*Pulsifer & Ludden and Frank A. Morey,* for plaintiff.

*Ryder & Simpson,* for defendant.

SITTING: CORNISH, C. J., SPEAR, PHILBROOK, DUNN, WILSON, DEASY, JJ.

DUNN, J.   Whether, as a result of new undertakings by its parties, a certain written contract was later abandoned for a new agreement, orally expressed, is a question vital in this controversy.

The systematic industry of counsel has collected a wealth of material either directly apropos of or having close analogy to the principle that, while the terms of one agreement may be abrogated, modified, or waived by another subsequently made (*Storer* v. *Taber,* 83 Maine, 387; *McIver* v. *Bell,* 117 Maine, 495), yet nothing short of cogent proof will establish the fact of a change in that which originally was reciprocally done. *Liberty* v. *Haines,* 103 Maine, 182; *Chaplin* v. *Gerald,* 104 Maine, 187; *Johnson* v. *Burnham,* 120 Maine, 491; *O'Keefe* v. *St. Francis Church,* 59 Conn., 551, 22 Atl., 325; *Ashley* v. *Henahan,* 56 Oh. St., 559, 47 N. E. 573; *Caldwell* v. *Schmulbach,* 175 Fed., 429; *James Riley Co.* v. *Smith,* 177 Fed., 168; *McKinstry* v. *Runk,* 12 N. J. Eq., 60; *Woarms* v. *Baker,* 82 N. Y. Supp. 1086; *Huntsville Club* v. *Building Co.,* (Ala.), 57 So., 750. Any other theory would be contrary to the common sense of judicial decisions. Even the free and easy liberty of general logic, which is prone to accept any and all evidence from whatever source and in whatever form, leaving the factor of error to be corrected, if at all, by a process of rebuttal, would regard the recognition of a superseding agreement, in the absence of evidence irresistible in character, as coming into conflict with its uncritical methods of reasoning.

The whole situation in the instant case is virtually an array of facts of varying degrees of importance. To begin at the beginning, under date of a day in May, 1920, (though the actual signing was somewhat later), these present litigants, in the renewal of a relationship first known between them in 1915, entered into a contract evidenced by writing, having chiefly to do with the cutting and the

hauling, by this plaintiff, of pulp wood from Oxford County land, and the driving of the wood by him into a boom in Parmachenee Lake, on the promise of being paid a definite price for every cord; plus the promise of an increase over that, graduated and limited with reference to possible advances in labor costs. The plaintiff started in on a performance before the terms of the agreement were written. When a written draft of the contract had been prepared, both parties signed it, and continued on thereunder. The plaintiff is insisting that, preliminarily to the meeting of the minds, as expressed in the writing, one Braman, a manager of the defendant corporation, represented to him that, through the next ensuing logging season, in connection with logging operations to be carried on by the defendant adjacently to where the plaintiff might operate, a greater rate than $3.25 a cord would not be paid to choppers; whereas, after the making of the agreement the defendant advanced its rate, at the first to $4.00, and eventually to $5.00.

The writing having been executed and delivered, but a short time elapsed, says the plaintiff, when it became manifest to him that the soaring of costs impended his financial disaster, and this in consequence of the high labor price being paid by the defendant, which occasioned an increase in the wage demanded at his own camp. Accordingly, runs the contention, on or about July 12th, 1920, when about 500 of a contemplated 7,500 cords of wood had been cut, the plaintiff telephoned Mr. Braman. Plaintiff tells the story of that conversation, the first between them on the topic, in these words:

"I asked Mr. Braman if the price they were paying crews there was so, and he said it was; he said it was local there. But the others down to Portland were paying that and he had to get the pulp. I says what about my paying more when it is going slow. I says I can't do it because I would have to pull out, I couldn't pay so much. And he said you go ahead the best you can. I will see no job go broke."

It is upon the asserted assurance: "you go ahead . . . I will see no job go broke," which it is urged has a background in the earlier inducing representation of Braman, that the plaintiff would build his case. Thereafter, on the plaintiff's version, the operation was conducted, not by the written contract, but under the new oral one. On this the plaintiff relies to recover the sums of money alleged to have been paid by him to finance the operation, in excess of what he had received; and also he relies on it to recover wages for his personal services in supervision.

It is unnecessary to inquire whether a representation regarding the wage of choppers was made. Were it made, it would lack merit. The plaintiff, it is true, quotes decisions in his effort to sustain his proposition that the evidence, which he introduced in this behalf against objection, was competent. He points, as with an index finger, to the case of *Neal* v. *Flint*, 88 Maine, 72, and stresses its directing sway. But, in comment on that decision; in *Burnham* v. *Austin*, 105 Maine, 196, this court has clearly stated an unwillingness "to extend the (its) doctrine of independent collateral agreements."

Few rules in the law of evidence are of wider application than that declaring extrinsic evidence of preceding or accompanying negotiations inadmissible to vary or to contradict, or to subtract from or add to, the language of a written instrument which speaks for itself in definite and final terms; fraud not being advanced and proved. The reason of the rule is, that as the parties have constituted the writing to be the only outward and visible expression of their meaning, no other words can be added to it, or substituted in its stead. 1 Greenl., 277. Says Dean Wigmore, in characteristic clearness:

"The so-called parol evidence rule is attended with a confusion and an obscurity which make it the most discouraging subject in the whole law of Evidence. . . . . First and foremost, the rule is in no sense a rule of evidence, but a rule of substantive law. It does not exclude certain data because they are for one or another reason untrustworthy or undesirable means of evidencing some fact to be proved. . . . What the rule does is to declare that certain kinds of fact are legally ineffective in the substantive law; and this of course (like any other ruling of substantive law) results in forbidding the fact to be proved at all." Wigmore on Evidence, Section 2400.

In easy paraphrase of the text writer, it is to be expected that negotiations both went before and went with the integration or embodiment of their net effect in a signed or otherwise adopted document. Because of the embodiment, the scattered parts that led up to it, however consequential they may have been before, have no longer any legal effect, for they have been reduced into and replaced by a single memorial. Wigmore, Section 2425. So is the modern general rule. The essence of our own related decisions is laid down in *Bassett* v. *Breen*, 118 Maine, 279, Mr. Justice MORRILL speaking:

"When parties put their contracts in writing, the writing must be considered as expressing the ultimate intentions of the parties to it,

and, in the absence of fraud, parol evidence is not admissible to alter
or modify the terms or legal effect of it.    All prior negotiations, or
so much of them as the parties see fit, are merged in the written
contract."

*Butterick Publishing Company* v. *Fisher*, 203 Mass., 122, is in point.
There, during the trading which led up to the making of a written
contract, a representative of one of the parties orally stated that it
was its policy to have but a single "agency" in a particular town,
and indicated its intention of ending the already existing one (as it
had a right to do), at the time that its contract with the other party
went into effect, so the latter might have an exclusive right of selling
a particular kind of garment patterns in the community; but it did
not terminate the existing agency.    Nor did the other party perform
his part.    In a suit against him for specific performance, he invoked
the oral statement.    Said the court:

"But the plaintiff came under no obligation to that effect in the
signed contract.  .  .  .  .    Where the trade finally struck between
the parties is put in writing, the writing sets forth the trade which is
struck.    For that reason evidence that during the negotiations the
plaintiff agreed by word of mouth that the defendant should be its
sole "agent", although not objected to, is not of consequence."

The supremacy of the writing, not because it is a writing, but
because it is the perceptible and self-speaking incorporation of the
terms agreed to, is the controlling idea.    Of course there are excep-
tions to the parol evidence rule (*Gould* v. *Boston Excelsior Company*,
91 Maine, 214; *Vumbaca* v. *West*, 107 Maine, 130), but the instant
case is not within them.

Plaintiff is positive in saying that the telephone conversation
occurred as related.    Indirect support of a new promise to the
plaintiff is given by his brother Hosea.    The support, however,
is vague.    Hosea testified that, about June 6, 1921,— (the tele-
phone conversation, if had, was in July before)—"although Mr.
Braman didn't say so in so many words," yet he inferred from
what Braman said that an adjustment saving his brother from
a loss would be made.    Again, that in December, 1920,—five
months after the insisted-upon telephone conversation—he heard
his brother and Mr. Braman say, each to the other in turn, that
a performance of the contract would be exacted, and that he, the
witness, supposed this to refer to the claimed superseding contract.

Dim as this testimony is, it is darkened by a letter that Hosea wrote. The letter, bearing date of June 16, 1921, primarily relates to work that Hosea himself had done for the defendant. But the writer mentioned other matters. In it he speaks of his brother's operation, of the resulting indebtment on the part of the latter to the other contracting party, and of his own unpaid wages for services there.

The past and present attitudes of the plaintiff are at variance. Without extending a detailed analysis of the evidence, it may be said that between August and the middle of December, 1920, the wage of logging labor had steadily and essentially advanced, and that the plaintiff frequently asked Braman if by conference with officers of the company outranking himself in authority, he would not endeavor to get an increased price for the operation. Plaintiff was not asking this as of right; rather was he seeking a concession in an exigency greater than the written contract's sliding scale had anticipated.

Braman denies that he agreed to make the endeavor. He denies the telephone conversation. He is emphatic that a new promise never was made, asserting his want of authority. Other witnesses, employees of the defendant, who had dealt with the plaintiff with respect to payments and related matters, while the operation was going on, say that no mention of the oral promise, now set up, was ever made by the plaintiff to either of them. Still another witness adds, that, about August 5th, 1920, plaintiff said: "things were going hard . . . . wanted to see if Mr. Braman couldn't intercede to get him a little more money." An interview between the plaintiff and Mr. Braman, on December 7, 1920, was taken down in shorthand. At that time,—if this present demand of the plaintiff be well-founded,—several thousand dollars were due and owing to him. The stenographer testified from her notes. Plainly, from her unshaken testimony, the plaintiff was regardful of the binding force of the written contract. He made no claim for payment. On the contrary, said he:

"I have run behind a good deal. I do not see what I shall do. It has been a harder job than I thought it would be. . . . Make me a different contract."

Thus, much is not all. An identifying or file number had been given the written contract by the defendant. All payments made

by the defendant to the plaintiff and receipted for by the latter, as the checks and vouchers show, have explicit reference both to the contract's number and its date. Correspondence between parties mentions the number. In August, 1921, the plaintiff distinctly asserted the existence of an oral agreement, in a letter. But in February before that, the plaintiff borrowed money from the defendant, to pay for horses worked in the operation, giving a mortgage of the beasts as a security for the payment of the loan.

Beyond this, so far as the asserted modifying oral agreement is concerned, it went only to the doing by the plaintiff of that which he already was legally bound to do. Therefore, the point of its nullity, for the want of a consideration, might becomingly be addressed against the present claim. *Wescott* v. *Mitchell*, 95 Maine, 377; 1 Williston on Contracts, Section 130; 1 Page on Contracts, Section 312. But decision is not hinged on this. Plaintiff's case does not meet the test in a subjective weighing of clear, convincing and conclusive proof. The disposing entry must be,

*Judgment for Defendant.*